9 F.3d 108
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Paul Carl KATSCHOR, Petitioner-Appellant,
v.
Henry GRAYSON, Respondent-Appellee.
 No. 93-1009.
 United States Court of Appeals, Sixth Circuit.
 Oct. 28, 1993.
 
 Before: MILBURN and GUY, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Paul Carl Katschor, an inmate at the Egeler Correctional Facility in Jackson, Michigan, appeals the district court's December 4, 1992 Opinion and Order Dismissing Petitioner's Habeas Corpus Petition. We affirm the district court for the following reasons.
 
 I.
 
 2
 On February 15, 1975, two men robbed the Park Grove Lounge in Detroit, Michigan. There were approximately 12 people in the lounge when the two men arrived at about 10:20 p.m. After each of the men ordered two Budweiser beers and V.O. whiskey chasers, one of the men (later identified by the patrons as petitioner Paul Carl Katschor) pointed a gun at the piano player and announced a robbery. The other man (later identified by witnesses as Robert Elmer Williams, Jr.) jumped over the bar and took money from the cash register. After firing a shot into the ceiling and announcing that "we mean business," the men robbed many of the patrons at gunpoint and forced Jean Zawacki, the owner of the lounge, to open the safe in the back room. The robbers then ordered the patrons into the kitchen and fled. Katschor and Williams were subsequently arrested while drinking Budweiser beers and V.O. whiskey chasers in Caps Bar in Detroit.
 
 
 3
 Twelve eyewitnesses to the robbery testified at trial. Five of the witnesses, including Jean Zawacki, identified both Katschor and Williams. Four of the witnesses did not identify either defendant. Three witnesses identified Williams as one of the robbers but were unable to identify the petitioner. Zawacki testified that the two men stood out because they were much younger, and more casually dressed, than the lounge's usual clientele.
 
 
 4
 Detroit police officer James Provato testified that he went to the lounge immediately after the robbery and retrieved a beer glass, a shot glass, and two beer bottles that the defendants were drinking from prior to the robbery. The glasses and bottles were later examined for latent fingerprints.
 
 
 5
 Detroit police officer James Kelly testified as a fingerprint expert. Kelly compared the latent prints on the glasses and bottles with petitioner's fingerprint exemplar made at the time of his arrest and identified petitioner's fingerprints on the beer and shot glasses. Katschor's attorney did not object to the admission of the fingerprint exemplar taken by Detroit police officer James Lindsay following petitioner's arrest.
 
 
 6
 Katschor offered numerous witnesses to support his claim that he was stuck in the snow in his sister's driveway when the robbery occurred. Though the petitioner did not testify, Williams denied that he was in the Park Grove Lounge that evening and testified that he was drinking Budweiser beer and V.O. whiskey chasers the day he was arrested because the petitioner bought the drinks for him. The jury nevertheless found both defendants guilty on all counts.
 
 
 7
 On October 5, 1976, the trial court judge sentenced Katschor to four concurrent terms of 40 to 60 years imprisonment to be served after a previously imposed 15 to 40 year sentence for armed robbery.
 
 
 8
 Katschor's conviction and sentence were affirmed on direct appeal. On July 6, 1979, the Michigan Supreme Court denied the petitioner's application for delayed leave to appeal.
 
 
 9
 Katschor subsequently filed his petition for a writ of habeas corpus in the district court on August 23, 1991, claiming ineffective assistance of counsel and the trial court's failure to grant him a continuance prior to trial. The district court judge referred the matter to a magistrate who, on September 28, 1992, recommended that Katschor's petition be denied. Katschor timely objected to the magistrate's recommendation. The district court dismissed Katschor's habeas petition after reviewing, de novo, those portions of the magistrate's Report and Recommendation that the parties objected to.
 
 
 10
 Katschor thereafter filed a timely notice of appeal challenging the district court's determinations.
 
 II.
 Ineffective Assistance of Counsel Claim
 
 11
 Katschor maintains that his trial counsel rendered ineffective assistance because he failed to object to the admission of petitioner's fingerprint exemplar, made following his arrest, as the tainted fruit of a warrantless arrest made without probable cause.
 
 
 12
 To establish ineffective assistance of counsel, Katschor must prove that his attorney's deficient performance prejudiced his defense rendering the trial unfair and the result unreliable. See Strickland v. Washington, 466 U.S. 668, 694 (1984) (defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). See also Kimmelman v. Morrison, 477 U.S. 365, 375 (1986) ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."). A reviewing court's scrutiny of counsel's performance is highly deferential. Strickland v. Washington, 466 U.S. at 689.
 
 
 13
 Though it is undisputed that no warrant had been issued for Katschor's arrest, the police arrested the petitioner at the Caps Bar and fingerprinted him at the police station. These fingerprints, when compared to the fingerprints found on the glasses and bottles at the Park Grove Lounge, placed the petitioner at the crime scene and corroborated the testimony of the prosecution's eyewitnesses. Because fingerprints taken at a police station may be suppressed as the tainted fruit of an illegal arrest if the prints were obtained following a warrantless arrest made without probable cause, Katschor argues that the police lacked probable cause to arrest him at the Caps Bar merely because he and Williams were drinking Budweiser beer and V.O. whiskey chasers.
 
 
 14
 The respondent, in turn, argues that the petitioner's claim cannot be resolved with the sparse record now before us because "the legality of the arrest was not put in dispute [and] evidence was not presented by the prosecution to establish probable cause." Appellee's Brief at 7-8. Because the magistrate and the district court judge properly concluded that the petitioner was not entitled to habeas relief because he cannot establish prejudice, we need not address Katschor's probable cause claim.
 
 
 15
 The magistrate and the district court judge concluded that it was irrelevant whether Katschor could suppress the fingerprint exemplar taken following his arrest at the Caps Bar because the state possessed numerous fingerprint exemplars (taken following petitioner's seven previous arrests) which would have been admissible at trial under the inevitable discovery doctrine discussed in Nix v. Williams, 467 U.S. 431 (1984).
 
 
 16
 Though Katschor maintains that but for his illegal arrest the police would not have known his identity, the petitioner's identity is not a fruit of the poisonous tree which may be suppressed. See United States v. Crews, 445 U.S. 463, 474 (1980) (a defendant "is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct.").
 
 
 17
 In Nix v. Williams, the Supreme Court held that, under the ultimate or inevitable discovery exception to the exclusionary rule, "[i]f the prosecution can establish by a preponderance of the evidence that [the challenged evidence] ultimately or inevitably would have been discovered by lawful means[,] then the deterrence rationale has so little basis that the evidence should be received." 467 U.S. at 444 (footnote omitted). In United States v. Cherry, 759 F.2d 1196 (5th Cir.1985), the Fifth Circuit noted:
 
 
 18
 The advent of an independent basis of probable cause relied upon by the district court would have necessarily occurred subsequent to Cherry's illegal arrest and detention on December 7.... We agree with the district court that Cherry eventually would have been lawfully arrested and fingerprinted but for the fourth amendment violation, and we therefore uphold the ruling of the district court in this regard.
 
 
 19
 Id. at 1207-08 (citations and footnote omitted). See also Id. at 1208 n. 16 ("By the time Cherry was brought before a magistrate, the FBI agents had uncovered [numerous] facts independently of prior misconduct.... We think that the laminated total of this information amounts to probable cause and that the district court's finding that the agents eventually would have acted upon the probable cause to arrest Cherry is not clearly erroneous.").
 
 
 20
 The Fifth Circuit's reasoning and conclusion is repeated in United States v. Garcia, 851 F.2d 361 (9th Cir.1988) (unpublished), cert. denied, 488 U.S. 1018 (1989):
 
 
 21
 [T]he inevitable discovery doctrine would allow the admission of Garcia's fingerprints into evidence. This exception to the exclusionary rule applies if the prosecution shows by a preponderance of the evidence that an exemplar of Garcia's fingerprints would have been discovered inevitably by lawful means.
 
 
 22
 Appellant Garcia has argued that his alleged illegal arrest was the "but-for" cause of the introduction of the fingerprint comparison. Even if this were true, the agents would have inevitably sought to possess an exemplar of Garcia's prints to compare them to those latent fingerprints found on the glassware in the house. Appellant Garcia suggests that, had Deputy McIntosh not taken the fingerprints at the station house on the day of arrest, the agent would not have been able to determine whose fingerprints were on the beaker later found in the bedroom closet of the DeLuz Road house. This argument lacks merit. From the facts and circumstances known to the agents on July 15, 1986, they would have had sufficient cause to continue to consider Garcia a possible suspect. They would no doubt have obtained his prints at a later time in accordance with a grand jury investigation.
 
 
 23
 Id. (citation and footnote omitted). See also United States v. Allen, 34 M.J. 228, 232 n. 3 (U.S. Court of Military Appeals) ("It is appellant's fingerprints which are the relevant evidence in this trial, not the vehicle for those fingerprints. Thus, assuming any illegality in obtaining the December 30 set of prints, the fact that that card was the vehicle that was admitted at trial does not legally or logically vitiate the sound application of the inevitable-discovery principle as to appellant's fingerprints."), cert. denied, 113 S.Ct. 324 (1992).
 
 
 24
 Pursuant to the inevitable discovery doctrine, and the cases interpreting its reach, we conclude that Katschor's fingerprint exemplar was properly admitted into evidence.
 
 
 25
 We similarly reject Katschor's claim that his trial counsel rendered ineffective assistance because he did not know that he could seek state funds to hire a fingerprint expert. Though a criminal defendant in Michigan is entitled to a state compensated defense expert to determine whether the "tests and conclusions of the prosecution's experts were faulty [or] their results were in error," In re Klevorn, 185 Mich.App. 672, 679 (1990) (per curiam), both the magistrate and the district court judge concluded that, even if counsel's performance was deficient, the petitioner had failed to demonstrate any prejudice resulting from the alleged deficiency. Though Katschor's trial counsel did not challenge the police expert's credentials, his testing procedures, or his conclusions at trial, the petitioner's attorney likely concluded that his challenges would have been futile.
 
 
 26
 Accordingly, we reject Katschor's ineffective assistance of counsel claim because the petitioner failed to prove trial counsel's deficient, and prejudicial, performance.
 
 
 27
 Trial Court's Failure to Grant a Continuance
 
 
 28
 Though the petitioner claims that the trial court deprived him of his rights to adequate assistance of counsel, effective cross-examination, and the presentation of a defense by denying his motion for a continuance prior to the start of trial, the magistrate determined that the trial court did not abuse its discretion by declining Katschor's requests for a continuance. See Bennett v. Scroggy, 793 F.2d 772, 774 (6th Cir.1986) ("[T]he constitutionality of a trial judge's refusal to grant a continuance depends on the circumstances of each particular case, evaluated in the light of the judge's traditional discretion to grant or deny such motions.").
 
 
 29
 Despite the magistrate's admonition that failure to file specific objections to the Report and Recommendation within ten days would constitute a waiver of all further rights to appeal, the petitioner only objected to "the application of the ultimate discovery rule" and "to the conclusion that the absence of a fingerprint expert being appointed for him was not prejudicial." Because Katschor failed to specifically object to the denial of his request for a continuance, we find that the petitioner waived appellate review of the issue. See United States v. Walters, 638 F.2d 947, 950 (6th Cir.1981) ("[A] party shall file objections [to a magistrate's report and recommendation] with the district court or else waive right to appeal.").
 
 III.
 
 30
 We AFFIRM the district court for the aforementioned reasons.